IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHARON LYNN AVILA, | ) | Case No. 5:23-cv-00873 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **MEMORANDUM ORDER** |
| | ) | **AND OPINION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Sharon Lynn Avila, seeks judicial review of the final decision of the Commissioner of Social Security, which denied her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act and for supplemental security income ("SSI") under title XVI.  Avila challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ's residual functional capacity finding ("RFC") did not properly account for certain mental limitations.  (*See* ECF Doc. 10).  She also contends that the ALJ failed to properly articulate her evaluation of the opinions of two of Avila's treating sources.  (*See* ECF Doc. 10).  The parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

Because the ALJ applied proper legal standards and reached a determination supported by substantial evidence, the Commissioner's final determination of Avila's applications for DIB and SSI must be AFFIRMED.

## II.    Procedural History

Avila filed applications for DIB and SSI on May 13, 2020.  (Tr. 15, 97).  Her alleged disability onset date in both applications was December 15, 2017.  (Tr. 15, 97).  Avila's disability claims were primarily based on alleged severe physical and mental conditions, including, post-traumatic stress disorder, major depressive disorder, panic disorder, bipolar disorder, polysubstance use, diverticulitis, irritable bowel syndrome, gastroesophageal reflux disease, anemia, status/post cervical C4-5 ADVF, status/post right ulnar release, and obesity. (Tr. 18).

Avila's applications for DIB and SSI benefits were denied both initially and upon reconsideration. (Tr. 15, 97, 117).  Avila requested a hearing.  Administrative Law Judge ("ALJ") Karen B. Kostol heard the matter on January 10, 2022 and denied the claims in an April 26, 2022 decision.  (Tr. 15–37).  In so ruling, the ALJ determined that Avila had the residual functional capacity ("RFC") to perform light work, with the following imitations:

> No climbing ladders, ropes, or scaffolds; can occasionally stoop, crouch, kneel, and crawl; can frequently climb ramps or stairs, and balance; must avoid all exposure to any hazards, such as dangerous moving machinery and unprotected heights; capable of simple, routine, and repetitive tasks, in a low stress job defined as having only occasional changes in the work setting and simple decision making required; capable of occasional interaction with the general public, co-workers, and supervisors; capable of occasional overhead reaching with bilateral upper extremities; and capable of frequent handling with the right upper extremity.

(Tr. 22).

On March 15, 2023 the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–4).  On April 26, 2023 Avila filed a complaint to obtain judicial review.  (ECF Doc. 1).

III.    Evidence

    A.    Personal, Educational, and Vocational Evidence

    Avila was 47 years old on the alleged onset date, December 15, 2017.  (Tr. 79).  Avila did not complete a high school education or obtain a GED.  (Tr. 263).  Avila had past relevant work as a waitress.  (Tr. 263).

    B.    Medical Evidence

    1.    Mental Health Records

    The ALJ's examination of medical records related to Avila's mental health treatment began with records from April 2020, generated after her appointments with treating psychotherapist Sylvia R. Diss, LCSW.  (Tr. 24).  Avila's mental health treatment records contain repeated references to Avila's extremely traumatic childhood.  Avila attributed many of her mental health symptoms – which were indicated to have first manifested in November 2019 – to the effects of her childhood trauma.  (*See, e.g.*, Tr. 802, 839).

    Throughout March and April 2020, Ms. Diss and treating psychiatrist Dr. Papadimitriou noted that Avila was aware that her relationship with her husband was not healthy, but she expressed that she did not feel strong enough at the time to handle separation from her husband. (*E.g.*, Tr. 1257, 1275).

    In June and July 2020, Ms. Diss noted that Avila cared for her grandson regularly.  (*E.g.*, Tr. 1302, 1306, 1318).  Other June 2020 notes indicated that Avila planned to divorce her husband when she felt strong enough, and that she watched her grandson three days per week. (*E.g.*, Tr. 1764).

    In October 2020, Avila was noted to be doing better, and her treatment notes indicated that she had left her husband and had received emotional support from her friends.  (Tr. 1788, 1795).  However, it was still noted that she felt overwhelmed easily, had some depression,

anxiety, and low self-esteem, but that she had been sleeping well and felt better because she had left her husband.  (Tr. 1788).

In December 2020, Avila was noted to be doing better because her husband was leaving her alone.  (Tr. 1806).  Treatment notes contained her reports that she and her husband had a plan to sell their house after the holidays and that she had been able to spend time with friends and have friends stay with her.  (Tr. 1806).

In March 2021, Ms. Diss noted that Avila's son experienced a psychotic break which required his hospitalization and triggered in Avila traumatic thoughts from her past.  (Tr. 2682). Ms. Diss noted, in the same appointment, that Avila had separated from her husband and was living with her daughter.  (Tr. 2682).  However, later in March 2021, Ms. Diss's notes showed that Avila's husband had broken his ankle and Avila was helping him around the house as a result, but that the house was "divided and he [was] leaving her alone so she [was] okay with the situation."  (Tr. 2703).

In July 2021, Ms. Diss noted that, although Avila still experienced some anger and irritability, she was doing better and was following up on getting a dissolution from her husband. (Tr. 2725).  Avila also indicated that she'd had some mild depression "due to lack of money, and problems with sleep."  (Tr. 2725).

In August 2021, Ms. Diss noted that Avila was "not doing well" and that "she [felt] she [had] been manic for the past 2 days as she restless, fidgety and unable to stop talking."  (Tr. 2748).  Avila was also noted to be concerned for her son, who had experienced another psychotic break, and to have low self-esteem because she had gained weight.  (Tr. 2748).

In October 2021, Ms. Diss noted that, though Avila felt her life remained problematic, she thought that she was handling things better.  (Tr. 2768).  Avila described that she experienced moderate depression and insecurity about her income, and that she feared becoming homeless again though she recognized that her fear was irrational.  (Tr. 2768).

In November 2021, Ms. Diss noted that Avila was doing better with the additional prescription of Lamictal to address mood fluctuations. (Tr. 2787). Avila also described that she enjoyed visiting with her daughter, that her son was doing much better, and that she was exercising and trying to be healthier. (Tr. 2787).

### 2. Physical Health Records

Avila suffered a head injury in or around late 2017 when she was struck in the head with a car trunk lid, (*see e.g.*, Tr. 400, 554), which caused neck pain, decreased range of motion, and numbness in her right hand. (Tr. 532–533). In December 2017, electromyography (EMG) analysis revealed severe right cubital tunnel syndrome. (Tr. 533).

Also in December 2017, X-rays of Avila's cervical spine showed degenerative or arthritic changes with foraminal stenosis bilaterally. (Tr. 2F, 158). X-rays of her right shoulder, also performed in December 2017, were normal. (Tr. 2F, 156).

In January 2018, Avila underwent ulnar release surgery. (*See* Tr. 1424). Subsequent treatment notes indicated that Avila experienced numbness even post ulnar surgery. (*See* Tr. 458).

In March 2018, treatment notes indicated that the physician's interpretation of an MRI of Avila's cervical spine indicated degenerative changes to the C4-5 and C5-6, specifically mild canal and mild to moderate right foraminal narrowing. (Tr. 461–462).

In August 2018, Avila underwent a microsurgical anterior cervical discectomy at C4-5, allograft fusion at C4-5, and Zephir anterior cervical plating at C4-5. (Tr. 463). Prior to her surgery, Avila showed cervical tenderness, but had intact strength, and there were no noted post-surgery complications. (Tr. 461–464).

In February 2019, records from Wheeling Hospital indicated that Avila received inpatient treatment due to gastrointestinal issues, which were ultimately determined to be diverticulitis and a pulmonary thromboembolism. (Tr. 356).

In July 2019, Avila again received inpatient treatment due to symptoms of regurgitation, recurrent diverticulitis, stomach swelling, and abdominal pain.  (Tr. 683).  Also in July 2019, Avila's lab results indicated that she was chronically anemic, which the records indicate was presumed to be a result of rectal bleeding and hemorrhoids.  (Tr. 559).  Avila was treated with iron infusions to address her anemia.  (Tr. 569, 573).  She was also prescribed Trulance for constipation, which was noted to allow her to have one bowel movement a day with no bleeding. (Tr. 683).  She also noted that Zofran helped reduce her nausea.  (Tr. 684).

December 2019 treatment notes indicated that Avila's abdominal pain was "a lot better, but still present" and she was treated for regurgitation, continued epigastric swelling, and constipation.  (Tr. 1099).  Avila was again noted to be taking Trulance for chronic constipation and being helped by Zofran for her nausea.  (Tr. 1099).

Throughout 2020, there was no record of inpatient treatment for Avila's gastrointestinal conditions.  (Tr. 25).

In August 2020, Avila sought medical treatment for what she believed was an allergic reaction.  Hospital records indicated Avila's reported history of having eaten two peaches in the early morning followed by hand swelling and itching.  (Tr. 1827).  Avila was also noted to be "talking very fast, unable to keep on track, arms and legs moving nonstop, [patient] appears manic[.]"  (Tr. 1827).  She stated that she "did a line of cocaine last night about 9:30 pm" and "she does not know if it was laced with anything."  (Tr. 1827).  The hospital notes indicated that she was not having any difficulty breathing or swallowing.  (Tr. 1827).  A hospital drug test of Avila's urine was positive for THC, cocaine, fentanyl, and amphetamines.  (Tr. 1646, 1831). The treating clinician concluded that Avila did not appear to be having an allergic reaction but was under the influence of an unknown substance; Avila was discharged and advised to stop taking drugs.  (Tr. 1831).

Treatment assessment notes in August 2021 indicated that Avila had had "unremarkable CT findings" which, among other findings, made it difficult to "attribute all her symptoms to diverticulitis." (Tr. 698).

In December 2021, Avila was again found to be anemic during a breast reduction surgery consultation. (Tr. 2157). Despite her anemia, Avila was able to proceed with surgery after iron infusion treatments and completed a post-surgery follow-up. (Tr. 2157). When Avila received iron infusions, she reported feeling less fatigue and no abdominal pain. (Tr. 2157). Notes indicated that Avila's treating physicians believed her anemia was likely due to bleeding from her diverticulosis and hemorrhoids as well as poor absorption, but her gastrointestinal issues were "mostly resolved" with her anemia treatments. (Tr. 2161).

## C.    Testimony

### 1.    Plaintiff

Avila testified at the ALJ hearing. (Tr. 46–70). Avila testified that at the time of the hearing she was fifty-one years old, five feet six inches tall, and weighed approximately 180 pounds, (down from 220). (Tr. 46–47). She further explained that she was in a marriage of 30 years and that, although she had previously moved out, she had moved back with her husband about six months prior to the hearing, because she did not want to be a "burden" for her daughter. (Tr. 47). Avila testified that she was able to drive, but that she hadn't been driving for about a month and a half, in part due to post-surgery restrictions. (Tr. 47).

Avila testified that she completed ninth grade in school but had not obtained a GED, because she "lived on the streets of LA" when her mom "threw [her] out." (Tr. 48). Though she did not continue her education, Avila testified that she was a foster parent to seven children and waited tables. (Tr. 49). Avila explained that her nephew, whom she adopted, was disabled due to an injury, and lived with her. (Tr. 49). She stated that she does not take care of her nephew, but her husband does. (Tr. 50). Avila also expressed that her daughter and grandson had also

previously lived with her, but that she was "too much for [her] daughter, so they moved out" about nine months prior to the hearing date.  (Tr. 50).  Specifically, Avila explained that she had "a lotta night terrors like the screaming in the night and it was scaring" her grandson, which prompted her daughter and grandson to move.  (Tr. 50).

Avila further testified that she could write and do basic math, like adding and subtracting, but that she did not have any vocational training, licenses, or certifications, that she did not serve in the Armed Forces, and that she did not receive any income or benefits.  (Tr. 51).

Avila testified that she became disabled in November 2017, following a head and neck injury when a car trunk hit her in the head.  (Tr. 52).  She explained that she was hospitalized after this incident and underwent three surgeries to her cervical spine and ulnar nerve as a result. (Tr. 52).  Avila also testified, "[T]hey said that I stored all the traumas and that put a dent in my skull and there's no room.  That's when the traumas started coming up that I never dealt with, so now I'm dealing with 'em all at the same time."  (Tr. 52).  When the ALJ asked for clarification on who "they" were, Avila explained that Dr. Papadimitriou had "said that that's exactly what it sounds like because I play a [reel] . . . a reel was going through my head of every bad thing that's ever happened and it just wouldn't stop."  (Tr. 53).  The ALJ had Avila clarify that there was not an actual dent in her head.  (Tr. 53–54).

As to her employment history, Avila explained that she had worked as a waitress at Bob Evans for the preceding 25 years, primarily on a part-time basis because she also was taking care of foster children.  (Tr. 54).  She explained that she was never marked as a full-time employee at Bob Evans, so that they wouldn't schedule her to a full-time shift, but that of the last 15 years she maybe worked three or four years on a full-time basis but that she couldn't answer the question because she didn't know how.  (Tr. 55).  During her employment as a waitress, Avila stated that she did not know how much the trays weighed so that she had "no clue" how much weight she would lift or carry.  (Tr. 56).  She did not know how long she could walk and

explained that on one day she might be able to lift or carry something but on the next she could not, depending on her gastrointestinal issues. (Tr. 63). She also may be able to eat something one day but would throw it up the next, "everything depend[ed] on the stress level." (Tr. 63). She also described sleep difficulty, but that medication has helped so she no longer had sleep paralysis all the time, just a couple times a month; but she still had bad dreams all the time. (Tr. 64). Avila explained that she would nap during the day for an hour or an hour and a half. (Tr. 64). As to her neck and spine condition, she said her neck always hurt, which had prompted her breast reduction surgery. (Tr. 65). She also testified to using an inhaler and that she had sleep apnea. (Tr. 65).

When the ALJ asked Avila to describe the condition or conditions that she believed prevented her from working, Avila described her PTSD and night terrors, along with her perception that something that may have taken a minute might seem like and hour, which would cause her to have a panic attack and that she would break down crying due to her trauma. (Tr. 57). Avila further explained that some of her records, specifically around December 2020, indicate improvement but that she was "lying a lot" to her counselors because she was embarrassed to be a victim and that she has since been honest. (Tr. 57). When the ALJ asked follow-up questions regarding Avila's statement that she was lying, Avila said that she "didn't mean lying" she meant that she "was embarrassed to be a victim." (Tr. 57–58).

On examination by her attorney as to her capacity to care for herself, Avila testified that she was unable to go to the bathroom because she was "bleeding all the time" but that she gets iron infusions intravenously; and she had "gnats" in her hair that no one can help her get out. (Tr. 58). She also explained that she may have two great days but then she will break down again, further that she "could do everything and then [she] can't find my shoes half the time." (Tr. 59). She further stated that she could do household errands maybe once a month, but that more often her husband will do them because she would "just start freaking out 'cause there's

just too many people in there." (Tr. 59).  Avila stated that she typically went in person to her doctor appointments but had not recently due to surgery.  (Tr. 59).  Avila testified that she did not cook, her husband brought her food, and that her husband was doing all of the house care. (Tr. 61–62).  She explained that she thought her trauma was keeping her from doing upkeep around the house.  (Tr. 62).

On follow up questions from the ALJ, Avila testified that she would journal to pass the time, but that she would not do any crafts or other activities and she would hardly watch the television. (Tr. 62).  She did not use the computer, but she would talk with a couple of friends, or they would come over if they weren't working.  (Tr. 62–63).  The ALJ asked Avila about drug use and Avila stated that she took cocaine that was laced with something in August 2020 when at a birthday party, the effects of which led to her hospitalization, but that she had not since used drugs she was not prescribed.  (Tr. 66).

### 2.    Vocational Expert

Vocational expert, Dana Marmo ("VE"), testified during Avila's hearing and provided her opinion in response to various hypothetical conditions posed by the ALJ.  (Tr. 70–78).  The ALJ informed the VE that because Avila did not know how much weight she could lift or carry, she would use the limitations described in the DOT for the job of waitress, which the VE stated she understood.  (Tr. 56).  The VE classified Avila's past employment as an informal waitress at a light exertional level.  (Tr. 71).

The ALJ's first hypothetical asked the VE to assume an individual of the same, age, education and experience as Avila with the following abilities: "capable of light exertional level work[;]" "can never climb ladders, ropes, or scaffolds[;]" "[c]an occasionally stoop, crouch, knee, and crawl[;]" "can frequently climb ramps or stairs and balance[;]" "must avoid all exposure to any hazards such as dangerous moving machinery and unprotected heights[;]" "capable of simple routine and repetitive tasks in a low-stressed job defined as having only

occasional changes in the work setting[;]" "capable of occasional interaction with the general public, co-workers, and supervisors[;]" "capable of occasional overhead reaching with the bilateral upper extremities[;]" and "capable of frequent handling with the right upper extremity." (Tr. 71).  The VE testified that the hypothetical individual would not be able to perform Avila's past work, but the individual would be able to perform other work such as, garment sorter, housekeeping cleaner, and marker.  (Tr. 72).

The ALJ next modified the hypothetical individual to be capable of having "no interaction with the general public" and "capable of no more than occasional decision-making." (Tr. 72).  The VE testified that this second hypothetical individual would be able to perform all the same jobs as the first hypothetical individual.  (Tr. 72).

The ALJ further modified the hypothetical individual to be "limited to no fast-paced production requirements."  (Tr. 72).  The VE testified that this third hypothetical individual would be able to perform all the same jobs as the first hypothetical individual.  (Tr. 72).

The VE further testified that a fourth hypothetical individual with the same capabilities as the third hypothetical individual, but with the limitation of only performing sedentary work, would also be able to perform work as a document preparer, mail sorter/addresser, and label maker.  (Tr. 73).

The VE testified that Avila's skills from her past work were industry specific and would not transfer into the residual functional capacity.  (Tr. 73).  She further testified that the threshold of time off task that employers may tolerate is "5% or an additional 24 minutes within an 8-hour workday outside of scheduled breaks."  (Tr. 73).

Avila's counsel posed the following hypothetical individual for the VE's assessment:

> An individual with the same age, education, and work background as [Avila] capable of performing light work, never ladders, ropes or scaffolds, occasionally stoop, crouch, kneel, crawl, frequently climb ramps and stairs, avoid all exposure to hazards, capable of performing simple repetitive tasks in a low-stress job with occasional changes and claimant will need major

> changes explained beforehand and gradually implemented to allow the person – excuse me – the hypothetical person would need the changes explained beforehand and gradually implemented to allow time to adjust to new expectations, occasional interaction with supervisors and co-workers, no interaction with the general public, occasional overhead reaching bilaterally, and frequent handling with the right upper extremity.

(Tr. 73). With some clarification from Avila's counsel, the VE testified that the positions she found available to the ALJ's hypothetical individuals would not have "significant changes" as described in his hypothetical description. (Tr. 76). But she clarified that if there would need to be weeks or months of training by an individual trainer in the available low-stress jobs described, that would likely not be tolerated because "that gets us back into being off task." (Tr. 76).

### D. Opinion Evidence

#### 1. State Agency Consultants

On September 15, 2020, state agency consultant Dr. Maureen Gallagher, found that Avila had the ability to perform light work[1] but with the following limitations: she could occasionally lift 20 pounds, and frequently lift 10 pounds; she could sit and stand and/or walk for six hours in an eight hour work day; she could never climb ladders, ropes, or scaffolds; she could frequently stoop, kneel, crouch, and crawl; and she could have no unprotected access to heights or heavy machinery. (Tr. 84). On February 19, 2021, Dr. Mehr Siddiqui, reached the same RFC determination upon reconsideration. (Tr. 103–104).

On September 11, 2020, Courtney Zuene, PsyD, found moderate limitations in Avila's ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace; along with a mild limitation in her ability to adapt or manage oneself. (Tr. 82). She found the further limitations that Avila could complete simple tasks that did not require fast pace or have a high production quota and that she should only have limited to

---

[1] Dr. Gallagher's report did not use the term "light work," but the exertional limitations indicated were consistent with the regulatory definition of light work as described in Social Security Administration rulings. *See, e.g.,* SSR 83-10.

superficial contact with the general public, co-workers, and supervisors.  (Tr. 85–86).  On February 8, 2021, Kristen Haskins, PsyD, reached the same conclusions, except she found moderate limitations in Avila's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and to adapt and manage oneself.  (Tr. 101–102).

### 2.     Treating Source Statements

On May 5, 2020, Dr. Paul Papadimitriou, Avila's treating psychiatrist, provided the opinions that Avila had: (1) mild limitation to her short- and long-term memories; (2) moderate limitations in remembering locations and work-like procedures, understanding and carrying out detailed but uninvolved instructions, and understanding, remembering, and applying instructions; and (3) marked limitations in the ability to interact with others, concentrate, persist, maintain pace, and adapt or manage herself.  (Tr. 1140–1141).  He also opined that Avila would be off task 25% of the time and that she would miss work four times a month.  (Tr. 1142).  Dr. Papadimitriou indicated that the following clinical findings supported his diagnoses: the severity of Avila's mental illnesses, C-Spine pain/issues, right should and ulnar nerve issues, GI issues, severe PTSD, agoraphobia, panic attacks, and inability to cope when in public. (Tr. 1138–1139). The opinions were expressed on a check box form.

On December 7, 2021, Dr. Papadimitriou provided a second treating source statement that identified the following psychological diagnoses: bipolar II disorder and post-traumatic stress disorder.  (Tr. 1921).  He further opined that Avila would be off task more than 25% of the time and that she would be absent from work more than 4 times per month.  (Tr. 1921).  Several other fields of this opinion were not completed, because Dr. Papadimitriou indicated that they were outside of his specialty.  (Tr. 1922–1924).

On February 4, 2022, after the telephone hearing with the ALJ, Dr. Papadimitriou provided a third treating source statement that identified the psychological diagnoses of: bipolar

disorder, type II and post-traumatic stress disorder since childhood.  (Tr. 2495–2499).  He also noted several clinical findings to support his diagnoses, including: not coping well, ongoing medical, family, and social stressors, feeling overwhelmed, no income, mood instability, depression, hypomania, sleep issues, being overwhelmed, panic symptoms, and post-traumatic stress symptoms.  (Tr. 2495–2496).  Dr. Papadimitriou also opined that Avila had: (1) mild to moderate limitations in her short term memory and in her ability to understand and carry out very short and simple instructions; (2) moderate to marked limitations in her ability to understand, remember, or apply information, her ability to interact with others, her ability to adapt or manage oneself, and in her ability to remember locations and work-like procedures; (2) moderate limitations in her long term memory; (3) moderate to extreme limitations in her ability to understand and carry out detailed but involved written or oral instructions; and (4) marked to extreme limitation in her ability to concentrate, persist, or maintain pace.  (Tr. 2497–2498).

On May 27, 2020, Licensed Clinical Social Worker Sylvia Diss, Avila's treating psychotherapist, provided a treating source statement in which she opined that Avila had: (1) mild limitations in short- and long-term memory; (2) moderate limitations in remembering locations and work-like procedures, understanding and carrying out very short and simple instructions, understanding and carrying out detailed but uninvolved instructions, understanding, remembering, and applying information, concentrating, persisting, and marinating pace; and (3) marked limitations in interacting with others and adapting or managing herself.  (Tr. 1233–1234).  Diss further opined that Avila would be off task 25% of the workday and, or she would miss more than four days per month.  (Tr. 1235).  She made several clinical findings to support her diagnoses, including that Avila experienced fear of public places and people, had abandonment issues and difficulty coping with life, and would have flashbacks of past abuse as a child.  (Tr. 1231–1232).

IV.     **Law and Analysis**

A.      **Standard of Review**

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id*. at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  Under the substantial evidence standard, the court cannot decide the facts anew, evaluate credibility, or reweigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If the ALJ's decision is supported by substantial evidence and reasonably drawn from the record, the ALJ's findings are conclusive, even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C.S. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) ("This court's review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards.") (Citation omitted).  Accordingly, the ALJ enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

However, the ALJ's decision will not be upheld if the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision if the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

**B.      Steps Four and Five: The ALJ's RFC contemplated Avila's mental health limitations and is supported by substantial evidence.**

Avila argues that the ALJ's RFC determination and ultimate non-disability conclusion are not supported by substantial evidence based, in large part, upon Avila's contention that the VE was unable to get an accurate portrayal of Avila's physical and mental capabilities through the ALJ's hypothetical questions.  (ECF Doc. 10 at 14).  Specifically, although the ALJ noted that Avila was "moderately limited in the ability to concentrate, persist, or maintain pace[,]" (Tr. 21), Avila argues that the RFC failed to account for this moderate mental limitation, which "deprived [the] court of a 'logical bridge between the evidence and the result.'"  ECF Doc. 10 at 13 (quoting *Bailey v. Comm'r of Soc. Sec*., No. 5:21-CV-02154, 2022 U.S. Dist. LEXIS 206991, at * 37 (N.D. Ohio Oct. 24, 2022) (R&R adopted).  The Commissioner disagrees and argues that Avila has not shown that the record of evidence would support a more restrictive RFC than was decided.  ECF Doc. 13 at 7.

 Regarding Avila's first assigned error concerning the sufficiency of the RFC findings, the court concludes that the ALJ applied proper legal standards and reached a decision supported by substantial evidence.  At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)).  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 416.929(a).  A person with an RFC to perform light work can lift no more than 20 pounds at a time, can frequently lift up to 10 pounds, and may perform work that involves "a good deal of walking or standing, or . . . sitting with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).  "[T]he determination

of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide." *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014); *see also* 20 C.F.R. § 416.946(c) (providing that the ALJ is responsible for assessing a claimant's RFC).

In *Howard v. Comm'r*, cited heavily in support of Avila's argument that the ALJ's RFC was deficient because it was based on inadequate hypothetical questions to the VE, the Sixth Circuit explained that "the RFC is meant to describe the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from – though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." 276 F.3d 235, 240 (6th Cir. 2002). In *Howard*, the RFC hypothetically posed to the VE, and ultimately adopted by the ALJ, was found improper because it was evident that the ALJ's RFC description was based on a selective view of the record. *Id.* By posing and ultimately adopting an RFC that was predominantly based on evidence that "cast [the claimant] in a capable light" the Sixth Circuit reasoned that suggested the ALJ "only considered part of the report in formulating" his RFC description. *Id.* As a result, the Sixth Circuit held that the RFC did not "accurately describe [the claimant's] abilities and that the ALJ's decision, which is based upon [the RFC], is not supported by substantial evidence." *Id.* at 241.

The hypotheticals posed during Avila's hearing – and the ALJ's RFC findings – do not raise the concerns addressed in *Howard*. As summarized above, the ALJ posed multiple hypotheticals to the VE, which accounted for varying degrees of limitations in both physical and mental capabilities. *See supra* III(C)(2). The ALJ specifically included characteristics of Avila's mental limitations in her hypothetical questions to the VE and then incorporated them in the RFC findings. Thus, the VE was able to consider these limitations in her assessment of what jobs a hypothetical person with Avila's limitations could perform. (Tr. 71) (describing a hypothetical individual that with capabilities limited to "simple routine and repetitive tasks in a low-stressed job defined as having only occasional changes in the work setting" and only

"occasional interaction with the general public, co-workers, and supervisors").  Thus, the VE here, unlike the VE in *Howard*, was given an accurate portrayal of Avila's physical and mental capabilities such that the ALJ's ultimate determination of not disabled is supported by substantial evidence, in the form of the VE's testimony and many other sources of record.

Further, the ALJ indicated that Avila's RFC was based on all of the medical evidence with which she was presented, not solely on the VE's responses to her hypotheticals.  (*E.g.*, Tr. 28) (stating that "the above residual functional capacity assessment is supported by the claimant's treatment records.").  Although the ALJ credited the VE's testimony that an individual with the same RFC and the same age, education, and work experience as Avila could not perform her past relevant work, (Tr. 28),  a statement which is not challenged, there is no indication that the ALJ's RFC findings rested solely on the VE's responses to hypothetical questions.  Rather, the ALJ's decision indicated that the ALJ examined the over 2000 pages of record medical evidence, of both physical and mental health treatments, in order to reach her determination.  (Tr. 22).

It is noteworthy that Avila's representative submitted various memoranda arguing, among other positions, that the RFC did not account for a moderate limitation in the area of concentration, persistence, and pace.  (*E.g.*, Tr. 353).  Specifically, Avila argued that a limitation to "simple, routine, and repetitive tasks" was not adequately defined, and she provided several alternative RFC limitations that she contended would adequately account for this moderate limitation.  (Tr. 353).  Avila raises the same argument now.  (ECF Doc. 10 at 12–14).  Avila contends that "there are *no mental limitations whatsoever* in the RFC that account for [Avila's] moderate limitation in ability to maintain [] concentration, persistence, or pace and the ALJ offers no explanation for said omission."  (ECF Doc. 10 at 12–13, emphasis added).  This statement is not supported by the record.

The ALJ explained that her RFC was designed to accommodate Avila's mental conditions through the following limitations: unskilled, low-stress work, with additional social interaction limitations.  (Tr. 25).  And the RFC itself limited Avila to "simple, routine, and repetitive tasks, in a low stress job defined as having only occasional changes in the work setting and simple decision making required; capable of occasional interaction with the general public, co-workers, and supervisors."  (Tr. 22).  By making these findings and statements, the ALJ addressed the specific mental limitation Avila argues about in her brief: her moderate limitation in her ability to maintain concentration, persistence, and pace.  The court rejects Avila's contention that "there are *no mental limitations whatsoever* in the RFC that account for [Avila's] moderate limitation in ability to maintain [] concentration, persistence, or pace."

The Sixth Circuit, in *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x. 426, 437 (6th Cir. 2014), concluded that, "the limitation to simple, routine, and repetitive tasks adequately conveys Smith–Johnson's moderately-limited ability 'to maintain attention and concentration for extended periods.'"  In so ruling, the Court expressly found that an RFC limitation to simple, routine, and repetitive tasks *did* address a moderate limitation in a claimant's ability to maintain concentration, persistence, and pace.  Thus, Avila's contention that her mental limitation was ignored by the ALJ fails in light of governing caselaw.

In *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625 (6th Cir. 2016), plaintiff, similar to Avila, argued that the ALJ's hypothetical questions to the VE did not adequately convey her mental health limitations, which made the ALJ's reliance upon VE opinions erroneous.  Avila argues, "[N]o hypothetical questions encompassing the ALJ's physical RFC and his [*sic*] finding of moderate mental limitation in ability to maintain concentration, persistence, or pace was posed to the VE."  ECF Doc. 10 at 13.  *Kepke*, like *Smith-Johnson*, firmly established that a hypothetical question which limits a worker to "simple, repetitive tasks" adequately addresses a moderate limitation in a claimant's ability to concentrate and maintain pace.  Generic challenges

to ALJ hypothetical questions which use the "simple, repetitive tasks" language will not succeed. The Sixth Circuit stated: "Case law in this Circuit does not support a rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence and pace." *Id.* at 635. Here, Avila has not said what precisely was lacking in the ALJ's hypothetical questions other that her generic – and incorrect – assertion that "no" hypothetical questions addressing the moderate mental limitation was posed. *Smith-Johnson* and *Kepke* mandate the rejection of this claimed error. *See also*, *Stoodt v. Comm'r of Soc. Sec.*, 2022 U.S. Dist. LEXIS 43108, at *34–35 (N.D. Ohio Jan. 13, 2022) (explaining that a limitation of simple, routine tasks was "consistent with restrictions found by other courts to accommodate moderate limitations in concentration, persistence and pace" and collecting cases which embrace that reasoning). While it might have been possible for the ALJ to provide alternative limitations that may have further accounted for Avila's mental limitations, Avila has not shown evidence that a more restrictive limitation was required or that the described limitations were otherwise inadequate. *See Bailey*, 2019 U.S. Dist. LEXIS 213398 at *49 (affirming RFC determination where claimant could not show that the evidence supported a more restrictive limitation for a moderate mental limitation).

In addressing Avila's moderate limitation in the area of concentration, persistence, and pace, the ALJ considered all of the evidence of record, including the VE's testimony, and crafted an RFC which adequately accounted for this limitation. Thus, Avila's first assignment of error provides no basis to remand the Commissioner's final decision.

    **C.**    **Step Four: The ALJ properly articulated the factors of supportability and consistency in analyzing the persuasiveness of the treating source opinions.**

Avila argues that, "[T]he ALJ's RFC is unsupported by substantial evidence because the ALJ failed to properly articulate her consideration of the supportability and consistency factors with respect to the opinions of treating sources, Dr. Papadimitriou and Sylvia Diss, LCSW." *See*

ECF Doc. 10 at 17 (citing Tr. 27–28).  The Commissioner disagrees, highlighting that the ALJ did discuss both the supportability and consistency criteria.  *See* ECF Doc. 13 at 8–11.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  Under current regulations, the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(b).  In her analysis of a medical source's opinion, the ALJ is required to explain how she considered the supportability and consistency of the source's medical opinion, but generally she is not required to discuss other factors.[2]  20 C.F.R. § 404.1520c(b)(2).  According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in finding that the statements submitted by Dr. Papadimitriou and Ms. Diss were not entirely persuasive.  (Tr.  27–28).  The ALJ applied the proper standards when she articulated that Dr. Papadimitriou's May 2020 statement was only mildly persuasive because his "opinion is a check box form with litter to *no written support or explanation* for the limitations provided . . .

---

[2] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

21

[rather it] simply sets forth the claimant's diagnoses and checks of certain symptoms, but does not cite any objective evidence or to treatment notes which would support such significant limitations.  Moreover, this opinion was provided during a short period of time when the claimant was first dealing with the idea of separating from her husband."  (Tr. 27) (emphasis added).  The ALJ further expressed that "a range of moderate mental limitations is *generally consistent* with the claimant's diagnoses, routine treatment, and minimally abnormal mental status examination findings[,]" but that the "marked limitations opined by Dr. Papadimitriou are *not consistent* with the record[.]"  (Tr. 27) (emphasis added).  The court has not quoted the entire ALJ discussion of Dr. Papadimitriou's May 2020 statement, but the remainder of the discussion cited specific facts and circumstances from Avila's treatment history.

As to Dr. Papadimitriou's two subsequent opinions, the ALJ properly described her reasons for rejecting them as not persuasive.  Specifically, she found his December 2021 opinion not persuasive because: "he [did] not complete the form . . . simply reiterates an off task limitation[], which is inconsistent with the record for the reasons detailed above."  (Tr. 28).  And, she found that his February 2022 opinion was not persuasive because  he "provid[ed] inadequate support for the limitations provided and fails to explain why he now opines to more significant limitations . . . simply set[ting] forth a few subjective mental symptoms" without citation to "any objective evidence or his treatment notes."  (Tr. 28).  Further, the ALJ stated that the Dr. Papadimitriou's marked and extreme mental limitations "are entirely inconsistent with the claimant's routine treatment, the evidence of symptoms that wax and wane, the evidence of some symptom improvement with her treatment, and the minimally abnormal mental status examination findings."  (Tr. 28).

Likewise, the ALJ properly applied the governing legal standards when she found that Ms. Diss's statement was only partially persuasive.  (Tr. 27).  Specifically, she expressed that although "this medical source statement *provides more written support* for the limitations

provided, with specific explanation for the limitations, the findings of marked limitations are *generally inconsistent* with the record as a whole[]" because "[m]arked limitations in social functioning and in adapting are *inconsistent* with [Avila's] ability to maintain friendships, her ability to care for herself and others, and her ability to hire a legal professional for her son." (Tr. 28) (emphasis added).   Additionally, the ALJ articulated that "a finding that [Avila] would be off task 25% of the workday and/or would miss more than 4 days a month, is *inconsistent* with the claimant's routine treatment and symptoms which wax and wane" and because "this opinion was provided during a short period of time when [Avila] was first dealing with the idea of separating from her husband."  (Tr. 28) (emphasis added).

Avila argues that the ALJ's "analysis of the supportability and consistency factors of these opinions was limited primarily to a criticism of the 'check box' formatting and a conclusory finding that [Avila's] symptoms 'wax and wane.'"  ECF Doc. 10 at 17 (citing Tr. 27–28).  This argument is easily dismissed when the actual content of the ALJ's decision is considered.  As highlighted above, the ALJ specifically discussed the supportability and consistency of the opinions of Dr. Papadimitriou and Ms. Diss.  Thus, Avila's contention that the ALJ gave short shrift to these regulatory factors misses the mark.  Additionally, the ALJ's observation that Avila's symptoms "waxed and waned" was only part of her detailed analysis of the evidence with which she was presented.  Avila is correct that the ALJ was not persuaded by opinions expressed on check box forms.  But an ALJ is permitted to consider whether an opinion expressed on such a form resulted in the failure of the opinion to adequately express the doctor's reasoning.  *See Kepke*, 636 F. App'x at 630 (reasoning that "[w]hile checklist opinions are not per se unreliable . . . it is not improper for an ALJ to take into consideration the format of a medical opinion, especially in light of the other factors in the record that signal unreliability."); *see also Cohen v. Sec'y of Dep't Health & Hum. Sevs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he

ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Avila further argues that the Commissioner's decision should be remanded because "the ALJ's decision does not indicate what objective findings on examination she considered in rejecting the opinions at issue, and does not explain how she considered any other evidence when making this determination." ECF Doc. 10 at 17.  In this regard, it seems that Avila is arguing that the ALJ's articulation of the supportability and consistency factors needed to include discussion of *all* "probative" evidence.  She highlights that there is objective evidence that contradicts the ALJ's conclusion, and supports her treating source statements, but argues that the ALJ failed to "reconcile that evidence with [her] decision." ECF Doc. 19 (citing Tr. 27).  Again, this argument is not sufficient to justify remand because an ALJ need not discuss *all* evidence in her articulating what substantial evidence supported her decision.  *See e.g.*, *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x. 248, 254 (6th Cir. 2016) ("[W]e do not require an ALJ to discuss every piece of evidence in the record to substantiate the ALJ's decision."); *Duk Bahudar Poudel v. Saul*, CASE NO. 1:20-cv-1246, 2021 U.S. Dist. LEXIS 127802, at *21 (N.D. Ohio Jul. 9, 2021) (Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (quoting *Simmons v. Barnhard*, 114 F. App'x. 727, 733 (6th Cir. 2004)).

What the court is called upon to do is decide whether what the ALJ did say supports her conclusions.  Neither the ALJ nor the court is required to explain whether there was other evidence in the record that could have supported the opposite conclusion.  The court must be satisfied that the ALJ considered all the evidence.  A review of the ALJ's decision confirms that the ALJ considered both evidence that was favorable to Avila's claims and evidence that undermined the claims.  For example, when discussing Avila's physical condition, the ALJ acknowledged Avila's negative EMG findings (Tr. 26), her ulnar release surgery (*Id.*), her

degenerative and arthritic changes, (*Id.*) and cervical discectomy at C4-5 (*Id.*). In the same paragraph, the ALJ found that following Avila's neck surgery she "had no significant treatment for neck pain" and demonstrated normal results in numerous subsequent examinations. (*Id.*) And the ALJ did the same sort of evaluation and explanation regarding Avila's mental health symptoms, treatments, and conditions during the period under adjudication. (*See* Tr. 24-25). This is precisely the sort of evidence evaluation and articulation the regulations require.

Although Avila calls out certain medical evidence that may tend to support her desired outcome, that does not negate that substantial evidence supported the ALJ's decision and that the evidence was properly considered. In many instances it is entirely possible for the ALJ's decision to be supported by substantial evidence, while an alternative outcome is simultaneously substantially supported. *O'Brien*, 819 F. App'x. at 416 (recognizing that substantial evidence standard precludes remand where the ALJ's decision is supported by substantial evidence, even "if substantial evidence, or even a preponderance of the evidence, supports the claimant's position.") (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 436, 477 (6th Cir. 2003)). The possibility of reaching an alternative conclusion, while simultaneously having a decision supported by substantial evidence, is precisely the "zone of choice" afforded to an ALJ in rendering her decision. *Mullen*, 800 F.2d at 545.

Because the ALJ properly considered the factors of consistency and supportability in her evaluation of Avila's treating source opinions and made a determination to discount those opinions that was supported by substantial evidence, and because the ALJ properly considered and explained her evaluation of the record evidence, Avila's second assignment of error provides no basis to remand the Commissioner's final decision.

## V. Conclusion

Because the ALJ properly formulated hypothetical questions to the VE and otherwise properly considered the evidence in creating an RFC that accounted for Avila's limitations, and

because the ALJ properly evaluated and explained her analysis of Avila's treating sources, the Commissioner's final decision denying Avila's claims for Social Security benefits is AFFIRMED.

**IT IS SO ORDERED.**

Dated: January 29, 2024

Thomas M. Parker
United States Magistrate Judge